**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**GARY A. HELMICK,**                      :
                                          :
  **Plaintiff,**                          :
                                          :   **Case No. 2:07-CV-912**
  **v.**                                  :
                                          :   **JUDGE ALGENON L. MARBLEY**
**SOLID WASTE AUTHORITY OF**              :
**CENTRAL OHIO**                          :   **Magistrate Judge King**
                                          :
  **Defendant.**                          :

## OPINION AND ORDER

## I. INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment. Plaintiff

Gary A. Helmick ("Helmick") filed suit against the Defendant Solid Waste Authority of Central

Ohio ("SWACO"), alleging that Defendant violated the Family and Medical Leave Act

("FMLA"). For the reasons set forth below, the Court **GRANTS** Defendant's Motion for

Summary Judgment.

## II. BACKGROUND

### A. Factual History

### 1. January 2 - 9, 2007 Work Absence

Helmick began working at SWACO in 1995. During all events giving rise to this case,

Helmick was employed as a Transfer Station Supervisor. On December 27, 2006, Helmick was

injured while on the job and filed a claim with the Bureau of Workers Compensation ("BWC").

The following day, Helmick went to America's Urgent Care for a medical examination.

America's Urgent Care ordered Helmick off work for two days and prepared a note to his

employer, stating,

> Your employee is ordered off work 2 days. They will be able to return to regular duty on 1/1/07. If you need a release to return to work, or any extension of this time. It should be obtained from your physician.

Helmick stayed home from work on Thursday, December 28th and Friday, December 29th.

Helmick was not scheduled to work over that weekend or on Monday, January 1, 2007.

On Tuesday, January 2nd, Helmick did not return to work. Instead, he went to an appointment with a physician at Ohio WorkHealth ("WorkHealth"). The WorkHealth physician asked Helmick what type of work he did, and he informed the physician. According to SWACO's written description of the position of Transfer Station Supervisor, most of Helmick's typical tasks involved supervisory activities that did not require any physical exertion. The only typical tasks that required physical exertion were: operating equipment (such as a front end loader) and performing minor repairs on specific facilities and mobile equipment used in the transfer operation. These tasks could require bending at the waist and lifting up to 50 pounds. Helmick admits that his job consisted of "primarily doing office work."

After Helmick told the physician about the type of work he did, the physician concluded he could return to work with restrictions regarding lifting, carrying, and bending, and wrote this down on a medical certification for Helmick to give to SWACO. Specifically, he was restricted to lifting or carrying no more than ten pounds and to bending no more than 30 degrees. The physician also stated he would reevaluate Helmick on January 19, 2007.

Helmick called his supervisor Joe Huston ("Huston") and told him that the physician said he would be off work for two weeks. Helmick alleges that because the physician said he would see Helmick again in two weeks, he thought he had been excused from work for that period. He

also alleges that the physician indicated SWACO would have to do without him for a while. However, Helmick admitted that the physician did not give him any slip that authorized him to not work for any period of time. And nothing in the medical certification the physician provided for Helmick to give to SWACO stated Helmick was excused from work. Rather, the certification stated he could return to work with certain restrictions.

Helmick had a second appointment at WorkHealth on January 8th. Again, the physician indicated he could return to work with minor restrictions regarding lifting and carrying. However, Helmick did not report to work that day or the next day. In total, Helmick did not work for the period of January 2nd through the 9th. Helmick alleges he continued to call Huston at least every other day during his absence to confirm that there were no problems with his time off.

Helmick called SWACO on January 9th and spoke with Brittney Hyett ("Hyett"), assistant human resources director. Based on the paperwork that Hyett had received from WorkHealth (which Hyett later discovered to be incomplete), Hyett told Helmick that she agreed it appeared he was off work. However, later that afternoon, upon receipt of all of the pages of paperwork form WorkHealth, Hyett discovered the physician's indication that Helmick should have returned to work on January 2nd. Therefore, Kathie McCalla ("McCalla"), human resources director, called Helmick to inform him he was absent without leave ("AWOL") and must report to work the following morning. McCalla also informed Helmick that it was his responsibility to review his paperwork from his physician and understand his own medical information.

### 2. January 10-17, 2007 Return to Work

Helmick returned to work on January 10th. He met with McCalla and Hyatt. McCalla looked at his medication, which included a muscle relaxer, a pain killer, and an anti-inflammatory. McCalla told him he could not run any equipment on the medication he was on, and he could not drive the company vehicle. However, Helmick was able to perform his supervisory and general duties, which consisted of keeping attendance, time-keeping, preparing EPA log reports and tonnage reports, and performing field inspections. McCalla informed Helmick that the physician had not provided authorization for leave for the period of January 2nd through 9th and that the physician indicated he could return to work. McCalla told him they would put down "job injury" for the AWOL period.[1] Helmick then went back to his office and did office work. SWACO never designated any of Helmick's time off as FMLA leave. SWACO, in fact, never considered the time for FMLA designation.

On January 16th, Helmick contacted McCalla to inform her he was no longer taking any of the medications prescribed by WorkHealth and to inquire whether he could operate SWACO equipment. McCalla sent a memorandum to Helmick that same day, memorializing their conversation and further verifying her communication with WorkHealth that Helmick was no longer prescribed any medication by WorkHealth. McCalla further indicated to Helmick that he could operate SWACO equipment but reminded him he was still working with lifting and carrying restrictions.

_____

[1]At SWACO, even leave classified as injury leave can lead to dismissal. According to Work Rule 7.5.1 Prohibited Conduct:

> Any unauthorized absence from duty constitutes AWOL. An unauthorized absence of five (5) consecutive working days from duty constitutes grounds for dismissal from SWACO employment. This rule may be applied involving the abuse of leave without pay (LWOP), injury leave, and sick leave.

During the period from January 10th to January 17th, Helmick appeared for work at SWACO. However, he claims that during this period, his pain and symptoms became progressively worse. He was unhappy with WorkHealth because he did not feel he was receiving any "treatment," just medication.[2] After working, Helmick was in more pain than he had been in the earlier part of January and his symptoms had gotten progressively worse.

### 3. January 18-March 2, 2007 FMLA-Qualifying Leave

Due to Helmick's dissatisfaction with WorkHealth, he called a chiropractor he had visited previously for an earlier injury. He saw the chiropractor several times a week beginning January 18th. At that first appointment, the chiropractor excused Helmick from work through January 22nd. On January 22nd, the chiropractor extended Helmick's leave through January 29th, writing, "Effective today, I have advised him . . . to discontinue work . . . for medical reasons. This restriction will remain in effect until 1-29-07." During a visit on January 26th, the chiropractor indicated that Helmick was totally disabled for the period of January 18th to February 13th. He was later excused through March 2nd.

For the period January 18th through March 2nd, Helmick provided SWACO with leave slips from the chiropractor. SWACO granted Helmick FMLA leave for those periods certified by the chiropractor. Helmick was not disciplined for taking any leave for this period, and Helmick does not claim that SWACO violated the FMLA relative to any of the leave granted during this

---

[2]Helmick had another appointment with WorkHealth on January 19th. Again, he was informed that he could return to work, and this was recorded on his medical certification. He was given restrictions again regarding lifting and carrying. However, this time he was restricted to *occasionally* (0% to 33%, est. 1-2 hours) lifting and carrying 11-25 pounds, as opposed to being restricted from *ever* lifting and carrying more than 10 pounds. There were no restrictions on bending.

period. After an examination with the chiropractor on March 2nd, Helmick returned to work on March 5th.

### 4. Suspension for AWOL Period

After returning to work, Helmick was notified of a pre-disciplinary hearing to be held on the charge of being AWOL for the period of January 2nd though 9th. Helmick attended the hearing on April 5th. Helmick brought all of his Ohio WorkHealth paperwork (i.e. paperwork form the appointments of January 2, 8, and 19, 2007). However, none of that paperwork provided any authorization excusing him from work or indicating he was incapacitated during the period of January 2nd through 9th. As stated before, the medical certification allowed him to return to work with certain restrictions. Helmick was suspended for two days and ordered to pay SWACO back for the days he was AWOL through his leave bank. To this date, Helmick has not provided any further medical documentation excusing him from work between January 2nd and January 9th.

### 5. Charge of Unauthorized Use of Company Property

During Helmick's recognized FMLA leave between January 18th and March 5th, he telephoned McCalla for instructions to access his SWACO email account remotely. McCalla indicated that he was not permitted to do so given that he was on work injury leave.[3] McCalla was subsequently informed by another employee that Helmick also called him later seeking the same information. Curious as to why Helmick was insisting on remote access to his email account, McCalla asked Joe Roush ("Roush") in the IT department to review Helmick's e-mail

---

[3]Employees who are non-exempt under the Fair Labor Standards Act are not permitted to work while on leave to avoid overtime issues.

for any peculiar messages. Roush reviewed Helmick's email and found numerous messages from e-Bay. He informed McCalla that it appeared Helmick was using his SWACO e-mail account to sell and purchase items on eBay.

Helmick admits that there were times he "looked at the messages from e-Bay" and would "access the e-Bay site" while on work time and could have also done some of his "bidding" on items posted on eBay. He admits he could have been using his SWACO computer and email for this purpose since 2005. Interhack, an entity employed by SWACO to determine whether Helmick accessed eBay through his SWACO computer and SWACO email account confirmed he has done so since 2005.

SWACO's employment manual provides the Work Rules and disciplinary policy for SWACO employees. Under section 7.5.1, prohibited conduct includes:

Work Rule 2   Sleeping or wasting time during prescribed work hour.

Work Rule 20 Abuse, misuse or deliberate destruction of SWACO property, including uniforms, tools, equipment or other SWACO property including damage done through carelessness or inattention.

Work Rule 27 Theft or misappropriation of property owned or operated by SWACO or of any employee of SWACO. Dishonesty towards fellow employees or management.

Helmick admits he was aware of these policies. And, Helmick admits he was in a supervisory position and responsible for enforcing these polices on the employees he supervises.

Helmick was notified of a pre-disciplinary hearing for violation of Work Rule 7.5.1, specifically nos. 2, 20, and 27. At the hearing on May 2nd, Helmick attended and testified. He did not dispute the charges and admitted he had used his SWACO email address for purposes of setting up an account with eBay. After the hearing, Huston, operations manager and supervisor

of Helmick, determined that Helmick was using his email address for personal gain, by making it his primary address for all eBay and paypal transactions. Huston found this to be a serious breach of SWACO's work policies and culture, and ordered the disciplinary decision moved up to the next level of the organization to the Assistant Executive Director Ronald J. Mills ("Mills") for a final decision, in which he recommended Helmick's termination. Huston also admitted that Helmick's January 2nd through 9th AWOL had some bearing on his decision to terminate Helmick.

On May 18th, Mills, who had final authority to terminate employees at SWACO, concurred with Huston's recommendation of termination. Helmick appealed this decision, but it was upheld by Michael D. Long ("Long"), Executive Director, on June 13th. Long stated that he took into consideration recent suspension time, which would include the AWOL suspension, in making his decision to uphold the discharge. Helmick alleges he was told that he was terminated for progressive discipline, which included the January 2nd through 9th AWOL period.

According to SWACO, Helmick was terminated due to his unauthorized use of SWACO equipment and SWACO work time to access eBay, which is a violation of SWACO policy. Helmick claims his termination was in retaliation for his absence between January 2nd and 9th, which he asserts was FMLA protected leave.

## B. Procedural History

Plaintiff filed this case on September 11, 2007, and asserted two counts against SWACO: (1) that Helmick was terminated from his employment with SWACO in retaliation for participating in the Workers' Compensation system and therefore violated public policy; and (2) that SWACO violated the FMLA. The Ohio Supreme Court's decision in *Bickers v. Western &*

*Southern Life Ins. Co.*, 879 N.E.2d 201, dispensed with Helmick's claim for retaliation in violation of public policy based on his filing of a claim with the BWC. Therefore, SWACO filed a Motion for Partial Summary Judgment on that claim. In response, Helmick filed an Amended Complaint without the public policy claim. Helmick also filed a Response to the Motion for Partial Summary Judgment, moving the Court to declare SWACO's Motion for Partial Summary Judgment moot. On March 10, 2009, the Court ordered that the Motion for Partial Summary Judgment was moot. On September 30, 2008, Defendant filed a Motion for Summary Judgment on the sole FMLA claim in the Amended Complaint.

### III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). But the non-moving party "may not rest upon its mere allegations." Fed.R.Civ.P. 56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

# IV. LAW AND ANALYSIS

Plaintiff alleges that Defendant violated the FMLA by: (1) utilizing Plaintiff's FMLA-qualifying leave time as a "negative factor" leading to discharge; and (2) retaliating and/or discriminating against Plaintiff for having taken FMLA-protected leave time. Plaintiff does not assert he was disciplined or discharged for his January 18th through March 2nd leave, which both parties recognize was FMLA-qualified leave. Nor does Plaintiff assert he was disciplined or discharged for his December 28th and 29th leave.[4] Rather, Plaintiff's sole assertion is that he was discharged due to being AWOL between January 2nd and 9th. Plaintiff asserts that this time was FMLA-qualifying leave, and therefore, his discharge was in violation of the FMLA.

The FMLA entitles qualifying employees to take up to twelve weeks of unpaid leave each year if, among other things, an employee has "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Pursuant to the FMLA, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). The Sixth Circuit recognizes "two distinct theories of recovery under the FMLA: (1) the 'entitlement or interference' theory arising under 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising under 29 U.S.C. § 2615(a)(2)." *Hoge v. Honda of Am. Mfg., Inc.,* 384 F.3d 238, 244 (6th Cir. 2004). Entitlement/interference claims are based on prescriptive rights, which establish entitlements to

---

[4]Plaintiff also recalled taking two other periods of FMLA leave during his employment with Defendant. He took two to three weeks of leave to take care of his wife, while she was suffering from a serious medical condition, and he took leave in May of 2006 for a back injury. He was not disciplined for either of those leaves and states that he did not feel he suffered any adverse employment action as a result of those leaves.

employees and set floors for employer conduct, while retaliation claims are based on proscriptive rights, which prohibit disparate employer conduct with regard to employees taking leave. *Taylor v. The Union Inst.*, 30 F. App'x 443, 452 (6th Cir. 2002). The allegations in this case could lend themselves to either an interference or retaliation claim. Therefore, this Court will analyze both.

## A. FMLA Interference

To establish that Defendant interfered with his rights under the FMLA, Plaintiff must show the following: (1) the Plaintiff is an FMLA "eligible employee;" (2) the Defendant is an FMLA employer; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled. *Calvin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003). In *Wysong v. The Dow Chemical Co.*, 503 F.3d 441 (6th Cir. 2007), the Sixth Circuit broadened the fifth element to include the situation where an employer used the taking of FMLA leave as a negative factor in an employment action. *Id.* at 447.

The first two elements are easily established. Plaintiff was an "eligible employee" as defined in 29 U.S.C. § 2611(2) because he worked over 1250 hours the prior twelve months before commencement of the period of leave in question. Defendant was an "employer" as defined in 29 U.S.C. § 2611(4) because it employed over fifty employees.

## 1. Serious Health Condition

The parties strenuously disagree, however, as to whether Plaintiff was entitled to take leave for a "serious health condition that makes the employee unable to perform the functions of such employee." *See* 29 U.S.C. § 2612(a)(1)(D). Whether an employee suffers from a serious health condition under the FMLA is a question of law for the Court. *Alston v. Sofa Express, Inc.*,

No. 2:06-cv-0491, 2007 WL 3071662, at *8 (S.D. Ohio Oct. 19, 2007) (citing *Bond v. Abbott Labs.*, 7 F. Supp.2d 967, 974 (N.D. Ohio 1998), aff'd, 188 F.3d 506 (6th Cir. 1999)). And a plaintiff may not avoid summary judgment on this issue by simply alleging his illness to be a serious health condition. *Id.*

A "serious health condition" means "an illness, injury, impairment, or physical or mental condition that involves–(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. §2611(11). Plaintiff asserts he suffered from an injury involving continuing treatment by a health care provider. "Continuing treatment by a health care provider" means,

> [a] period of incapacity (i.e. inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition.

29 C.F.R. § 825.114(a)(2)(I). A plaintiff seeking to prove that he has a serious health condition must demonstrate that the condition rendered him incapacitated for more than three consecutive days. *Alston*, 2007 WL 30711662 at *8. The *Alston* court reasoned:

> Incapacitation for the purposes of the FMLA does not mean that, in the employee's own judgment, he or she should not work, or even that it was uncomfortable or inconvenient for the employee to have to work. Rather, it means that *a 'health care provider' has determined that, in his or her professional medical judgment, the employee cannot work (or could not have worked) because of the illness.* . . . Generally, then, a plaintiff must come forward with some evidence that a health care provider has instructed, recommended, or at minimum authorized an employee not to work for at least four consecutive days for that employee to be considered incapacitated for the required period of time under the FMLA.

*Id.* (internal citations omitted).

## 2. Medical Certification

The FMLA does not require medical certification. The FMLA permits employers to require medical certification pursuant to 29 U.S.C. § 2613(a) and (b), which states, in pertinent part:

> An employer may require that a request for leave . . . [for a serious health condition] be supported by a certification issued by the health care provider of the eligible employee . . . Certification . . . shall be sufficient if it states–(1) the date on which the serious health condition commenced; (2) the probable duration of the condition; (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition; . . . (4)(B) . . . *a statement that the employee is unable to perform the functions of the position of the employee.*

(emphasis added). Defendant's employment manual sets out the company's policies regarding the FMLA. Under section 5.5.4. Medical Certification, it states "SWACO will require that a family or employee health leave may be supported by certification from the health care provider." Therefore, pursuant to Defendant's policy and in compliance with the FMLA, Plaintiff was required to submit medical certification for his absence between January 2nd and January 9th. Defendant also specifically requested Plaintiff provide medical certification for that absence.

Plaintiff in fact submitted medical certification, produced by WorkHealth on January 2nd. The certification produced by WorkHealth, however, did not state that Plaintiff was unable to work. The physician did not check the box that stated: "Will be unable to work for _____ day(s)" and did not list a period when Plaintiff would be unable to work. Instead, the physician checked the box that stated: "May return to work with the following restrictions, as indicated on the attached work restriction page."

Defendant asserts that it was entitled to rely on the WorkHealth physician's "negative

certification." The "negative certification" principle applies when the certification affirmatively states that despite the employee's recognized medical condition, the employee is not required to miss any work due to the condition. *Fritz v. Phillips Serv. Indus., Inc.*, 555 F.Supp.2d 820, 824 (E.D. Mich. 2008). The court in *Stoops v. One Call Comm., Inc.*, 141 F.3d 309 (7th Cir. 1998) noted:

> Where an employer . . . requests from the employee and receives a physician's certification that indicates that an employee's serious health condition does not require him to miss work, the employer may rely on that certification until the employee provides a contradictory medical opinion.

*Id.* at 313; *accord Nawrocki v. United Methodist Ret. Cmtys.*, 174 F. App'x 335, 338 (6th Cir. 2006)*; Brady v. Potter*, 476 F.Supp.2d 745, 757 (N.D. Ohio 2007); *Hoffman v. Prof'l Med. Team*, 270 F.Supp.2d 954, 964 (W.D. Mich. 2003).

In *Nawrocki*, *Brady*, and *Stoops* the physician providing the certification certified that the employee suffered from a medical condition; however, the physician concluded that this condition did not require the employee to miss work. *Nawrocki*, 174 F. App'x at 338; *Brady*, 476 F.Supp. 2d at 758; *Stoops*, 141 F.3d at 313. The employee knew that the employer was relying on the negative certification, but did nothing to obtain a contrary opinion. *Brady*, 476 F.Supp. 2d at 758; *Stoops*, 141 F.3d at 313.

Similarly, in this case, the WorkHealth physician concluded that Plaintiff suffered from a back condition; however, the physician also concluded that Plaintiff could return to work with certain restrictions. Defendant informed Plaintiff that it was relying on the physician's conclusion that he could return to work. Plaintiff did not provide a contrary opinion from another physician stating that Plaintiff could not work between January 2nd and 9th.

Plaintiff could have had another physician reevaluate his condition after January 9th to

-14-

determine whether he should have been excused from work between January 2nd and 9th. *See*

*Sims v. Alameda-Contra Costa Transit Dist.*, 2 F.Supp.2d 1253, 1263 (N.D. Cal. 1998).

However, Plaintiff has never provided a contrary opinion from another physician that he was

incapacitated for that period.[5] Defendant was entitled to rely on the certification, provided on

January 2nd, that Plaintiff was not suffering from an FMLA qualifying condition.

### 3. Essential Functions

Plaintiff asserts that despite the physician's negative certification that Plaintiff could

indeed work, due to the restrictions on lifting, carrying, and bending, and due to the medicine he

was taking, he was actually unable to perform the functions of his position. Pursuant to 29 C.F.R.

§ 825.115,

> An employee is "unable to perform the functions of the position" where the health
> care provider finds that the employee is unable to work at all or is *unable to
> perform any one of the essential functions of the employee's position* within the
> meaning of the Americans with Disabilities Act (ADA), 42 USC 12101 et seq.,
> and the regulations at 29 CFR § 1630.2(n) . . .

(emphasis added).

"The term 'essential functions' means the fundamental job duties of the employment

position the individual with a disability holds or desires. The term 'essential functions' does not

include the marginal functions of the position." 29 C.F.R. § 1630.2(n); *Verhoff v. Time Warner

Cable, Inc.*, Nos. 07-4265 and 07-4348, 2008 WL 4691794, at *7 (6th Cir. Oct. 24, 2008). A job

function may be considered essential when the reason a position exists is to perform that

function, because of the limited number of employees available among whom the performance of

---

[5]In fact, Defendant received two additional "negative certifications" from WorkHealth on
January 8th and January 19th, both affirming that Plaintiff could work.

that job can be distributed, and/or because the function is highly specialized. 29 C.F.R. § 1630.2(n). The determination of whether a function is essential to a job "should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1078 -79 (6th Cir. 1988). Evidence of whether a particular function is essential includes, but is not limited (I) the employer's judgment as to which functions are essential; (ii) written job descriptions; (iii) the amount of time spent on the job performing the function; (iv) the consequences of not requiring the employee to perform the function; and (v) the current work experience of the employees in similar jobs. *See id.* The court in *Verhoff* identified the circumstances where an employee cannot perform the essential functions of the job:

> As the regulations indicate, the typical case where an employee cannot perform the "essential functions" of her job involves a plaintiff whose disability physically limits her ability to do her job's routine tasks, such as a packager who can no longer lift heavy packages because of a neck injury.

2008 WL 4691794 at *7.

The evidence shows that Plaintiff's primary duty as a Transfer Station Supervisor was to supervise the operators. He would make sure the scale house was operating properly, the tipping floor was operating properly, and the right employees were in the right place at all times doing their jobs. Typical tasks he performed included completing daily reports, EPA reports, and daily tonnage reports, and handling personnel issues and disciplinary actions.

### a. Physician Imposed Restrictions

Plaintiff admits that his job consisted of "primarily doing office work." Nevertheless, he asserts that lifting and carrying over ten pounds and bending more than 30 degrees, all of which he was restricted from doing by the WorkHealth physician, were essential functions of his job.

There must be evidence that a "health care provider has instructed, recommended, or at minimum authorized an employee not to work." *Alston*, 2007 WL 3071662 at *8; *see also Bradley v. Mary Rutan Hosp. Assoc.*, 322 F.Supp.2d 926, 943 (S.D. Ohio 2004) ("in order to show that he or she was 'required' to miss work for more than three days, a plaintiff employee must show that he or she was prevented from work because of the injury or illness based on a medical provider's assessment of the claimed condition . . . it means that a 'health care provider' has determined that, in his or her professional medical judgment, the employee cannot work (or could not have worked) because of the illness")*; Olsen v. Ohio Edison Co.*, 979 F.Supp. 1159, 1165 (N.D. Ohio 1997) (an employee cannot show a "required" absence unless a health care provider authorizes a period of absence that exceeds three days). Plaintiff admitted at his deposition that the WorkHealth physician asked him what type of work he did, and he informed the physician. Based on the type of work Plaintiff did, the physician concluded he could return to work with restrictions. The physician did not recommend or authorize his absence from work.

An employer may determine that even though a physician has authorized an employee to return to work, the physician's work restrictions render the employee unable to perform the essential functions of her job. *Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1004 n.4 (6th Cir. 2005). When Defendant received Plaintiff's certification, however, it concluded that Plaintiff could return to work and perform the essential functions of his position with the physician's restrictions on lifting, carrying, and bending. In the absence of evidence of discriminatory animus, courts generally give "substantial weight" to the employer's judgment as to what functions are essential. *Kvorjak v. Maine*, 259 F.3d 48, 55 (1st Cir. 2001). This Court has not found legal support for the proposition that an employee may determine that he is unable to

return to work in the face of his physician's and employer's determinations that he can work. Therefore, Plaintiff has not shown he was entitled to leave under the FMLA because he has not shown that the restrictions on lifting, carrying, and bending prevented him from performing the essential functions of his position.

### b. Employer Imposed Restriction

Plaintiff's written job description also lists as a "typical task" that the Task Station Supervisor, "operates equipment such as the front end loader."  Defendant asserts that Plaintiff could operate the front end loader with a ten pound lifting and carrying restriction, and he would only need to bend in order to get in and out of the loader, similar to getting in and out of an automobile or in and out of bed. Plaintiff does not appear to dispute this. However, though the physician's restrictions did not exclude him from operating heavy equipment, the Defendant restricted him from operating heavy equipment due to his medications. This was a restriction Defendant imposed for safety and liability purposes for a six day period while he was on medications that could make him drowsy. This restriction was lifted on January 16th, once Plaintiff was taken off the medications. Defendant asserts that operating heavy equipment was not an essential function of Plaintiff's position.[6]

The only time Plaintiff would operate this equipment was when he needed to cover his employees, the actual equipment operators, during their lunches and other breaks. The Transfer Station Supervisor position does not exist to perform the function of running a front end loader; this is the essential function of an operator, a position which reported to Plaintiff. Plaintiff would

---

[6]Defendant asserts that there are lots of medications people take on a regular basis that might make them drowsy, but that does not mean they are entitled to FMLA leave.

spend, at most, 30 to 40 minutes of his eight hours of work time covering his employees on the front end loader, at his election.

If Plaintiff could not run the front end loader, another operator could perform that task. He admitted at his deposition that he had a different back injury in May of 2006. After that injury, he stayed off the equipment because Defendant did not want him climbing up and down with his injury. Plaintiff testified:

> Q. Did you go back to doing the exact same job after your May injury?
>
> A. Well, I stayed off the equipment . . . they told me . . . don't be climbing up and down the equipment until you get 100 percent healed. I was a supervisor, so I just – more or less paperwork and stuff. I could have other guys do it.

(Helmick dep. p. 54-55). Even after he was allowed back on the equipment, he did not operate the equipment as much through December 2006. Plaintiff testified:

> Q. So between May and December, you didn't operate the equipment?
>
> A. Yeah, I did, but not as much. . . . because the bouncing on the hard concrete floor . . . irritated my back to where it would be swollen at the end of the day, and the next morning when I go to get up, it was really stiff, and it was real sore.

(*Id.* at p. 55). When Helmick did fill in on the equipment he admitted "you mostly just sit in the equipment. You really don't have to run it because lunch is pretty dead around there." (*Id.* at 75).

So, in December 2006 when Helmick hurt his back again, which led to the injury Helmick asserts is FMLA-qualifying, he was already "primarily doing office work because [his] back hurt to work equipment" due to his May 2006 injury. (*Id.* at 74). Thus, by Helmich's own testimony, when the December injury occurred, other employees were filling in and operating the equipment, he was barely operating the equipment, when he did fill in on the equipment he mostly just sat there, and he was primarily doing paperwork.

-19-

Accordingly, the Court finds that the function of operating heavy equipment was not essential for the following reasons: Defendant asserts this function was not essential[7]; Plaintiff's position did not exist to perform this function; this function was not highly specialized; this function was only listed as one of many tasks in his job description; he spent minimal time performing this function; if he did not perform this function (as he had not in the past seven months prior to the December 2006 injury) there were not any consequences; and he could get another employee to perform this function. Furthermore, this was not a restriction imposed by a health care provider because Plaintiff was physically unable to perform the essential functions of the position; rather, this was a restriction imposed by Defendant for safety and liability reasons. Plaintiff has not shown he was entitled to leave under the FMLA because he has not shown that the restriction imposed by Defendant against operating heavy equipment, due to the medications Defendant was taking, prevented him performing the essential functions of his position.

### c. Employee Imposed Restriction

In spite of the physician's and Defendant's conclusions that Plaintiff was able to work, Plaintiff seems to contend that an employee can designate his own serious health condition for purposes of entitlement to leave under the FMLA. An employee cannot determine that he has an FMLA-qualifying condition, in the face of both his physician and employer telling him that he is able to do his job. If that were the case, every time an employee was sick or injured, he could decide that despite his physician's and employer's evaluations, he should be excused from work.

Plaintiff has produced no evidence to demonstrate that he was entitled to FMLA leave for

---

[7]As stated before, in the absence of evidence of discriminatory animus, courts generally give "substantial weight" to the employer's judgment as to what functions are essential. *Kvorjak*, 259 F.3d at 55.

the period of January 2nd through January 9th. The WorkHealth physician who examined him on January 2nd, 8th, and 19th did not excuse him from work for the period in question. In addition, the chiropractor who examined him on January 18th did not excuse him from work for the period in question.[8] As Plaintiff did not have any other physicians retroactively evaluate his condition to determine if they could provide him a medical certification for that period, Plaintiff cannot now claim, with no medical support, that his back injury was FMLA-qualifying between January 2nd and January 9th.

Plaintiff also argues that because WorkHealth refused to release Plaintiff to perform the "full job" he was working at the commencement of leave, he was entitled to FMLA leave. However, he provides no support for this proposition. There is no requirement that an employee be able to perform his "full job," or else be entitled to FMLA leave. Rather, the employee just must be able to perform the essential functions. Plaintiff has not shown he was entitled to leave under the FMLA because he has not shown he had a serious health condition that prevented him performing the essential functions of his position. Therefore, summary judgment on this issue is **GRANTED**.

---

[8]Though the chiropractor excused him from work from January 18th through March 2nd, Plaintiff admitted that when he saw the chiropractor, he was in more pain than he had been in earlier in January when he met with the WorkHealth physician. He also admitted that his injury had gotten progressively worse since seeing WorkHealth, which is why he went to the chiropractor, hoping he could provide treatment and not just medication. Therefore, just because Plaintiff was excused from working after January 18th does not mean he should have been excused for the earlier period.

## B. FMLA Retaliation

In order for Plaintiff to establish that Defendant retaliated against Plaintiff in violation of the FMLA, Plaintiff must be able to show that: (1) he availed himself of a protected right under the statute by requesting and receiving FMLA leave from Holzer Clinic; (2) he experienced an adverse employment action; and (3) a causal connection between his exercise of his FMLA rights and the adverse employment action exists. *See Gembus v. Metrohealth Sys.*, No. 07-3542, 2008 WL 3977528, at *3 (6th Cir. Aug. 27, 2008).

Plaintiff cannot establish the first element, that he availed himself of an FMLA protected right relative to leave. As set forth above, Plaintiff was not entitled to FMLA leave for the period of January 2nd to 9th. Because he cannot establish that he had a serious health condition that rendered him unable to perform the essential functions of his position, and thereby entitled him to leave and protection under the FMLA, there can be no discrimination or retaliation on the part of Defendant arising from that absence. *See Alston*, 2007 WL 3071662 at *10. Therefore, summary judgment on this issue is **GRANTED**.

## V. CONCLUSION

For the foregoing reasons, this Court **GRANTS** Defendant's Motion for Summary Judgment.

**IT IS SO ORDERED.**

<u>    s/Algenon L. Marbley    </u>

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT COURT**

**Dated: March 10, 2009**